Filed 7/13/22  P. v. Manjarrez CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　v.<br><br>FRANCISCO BEJARANO MANJARREZ, JR.,<br><br>　　　Defendant and Appellant. | D078837<br><br><br>(Super. Ct. No. BLF1800240) |

APPEAL from a judgment of the Superior Court of Riverside County, Dale R. Wells, Judge.  Affirmed.

Wallin & Klarich and Stephen D. Klarich for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Steve Oetting, Acting Assistant Attorney General, Arlene A. Sevidal and James M. Toohey, Deputy Attorneys General, for Plaintiff and Respondent.

A jury found Francisco Bejarano Manjarrez, Jr. guilty of one count of domestic battery of his girlfriend (Valeria), two counts of forcibly committing lewd acts on one of Valeria's daughters (Kaylee), and three counts of forcibly committing lewd acts on another of Valeria's daughters (Angelina).  The jury

also found true the allegation that Manjarrez committed qualifying sex offenses against multiple victims.  The trial court imposed five consecutive 25-to-life prison terms on the sex offense convictions, and a concurrent one-year term on the battery conviction.

Manjarrez raises several challenges on appeal.  First, he claims insufficient evidence supports his forcible lewd act convictions.  Second, he contends the trial court committed instructional errors in connection with the sex offense counts.  Third, he contends the trial court erred by allowing the prosecutor to cross-examine a defense expert about her work in a prior case and about a California Supreme Court opinion that contradicted her opinions in this case.  Relatedly, Manjarrez maintains this cross-examination also constituted prosecutorial misconduct.  Finally, Manjarrez makes a cumulative error claim.  For reasons we will explain, we conclude none of these claims has any merit.

Accordingly, we affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### Prosecution Evidence

*Family Background*

Manjarrez was born in 1984 and began dating Valeria in 2008. Manjarrez had a daughter from a previous marriage, and Valeria had three daughters and one son from previous relationships.

In 2009, Valeria and her children moved in with Manjarrez and his daughter in his three-bedroom house on Hidden Springs, near a freeway, in Blythe.  Manjarrez and Valeria had the master bedroom; his daughter, who alternated weeks at her mother's house, had her own bedroom; and Valeria's four children shared the other bedroom.  They lived in this house until 2011,

when it became subject to foreclosure proceedings.  Valeria and Manjarrez moved in with his mother, and Valeria's children stayed with her mother.

In 2011, Manjarrez and Valeria had a son together.  In 2013, they had a daughter together.

In 2016, Manjarrez, Valeria, and all their children moved into an apartment together.

### Domestic Abuse of Valeria

Valeria testified at trial about Manjarrez's history of abusing her.

Manjarrez began verbally abusing Valeria when they lived in the house on Hidden Springs (between 2009 and 2011).  He called her "a slut, a whore, [and] garbage."  He verbally abused Valeria in front of her children, whom he called "mutts."  During incidents of abuse, the children "would go to their room and just kind of stay out of his way."

In 2010, Manjarrez began throwing objects during arguments.  The arguments were usually about Valeria's children being "too loud," "mak[ing] a mess," or "tak[ing] something they weren't supposed to touch," or about Manjarrez thinking Valeria "was always trying to communicate with the father of [her] other kids."

In 2010 or 2011, the abuse turned physical.  Manjarrez learned Valeria had misled him about Kaylee and Angelina having the same father.  Manjarrez became "outrageously mad about the whole situation" and punched Valeria in the stomach while she was pregnant with Manjarrez's son.  The children saw this abuse and were "yelling because they were scared."  A social worker with child protective services who was coming by the house to check on the children saw that Valeria's face was flush and that

3

she had fingerprints on her neck. Police arrested Manjarrez, but Valeria did not cooperate; instead, she bailed him out a day or two later.[1]

Also while they lived at the Hidden Springs house (between 2009 and 2011), Manjarrez punched Valeria in the face, on the side of her head, and on her back. One of the punches broke Valeria's nose and gave her two black eyes.[2] Manjarrez also grabbed her by the arms, leaving bruises.

Manjarrez continued to refer to Valeria's children as "mutts," and during "[a] lot of the fights . . . he would tell them, 'It's your fault why me and your mom are fighting.' "

"The shoving, grab[bing], hitting, [and] punching" continued while Manjarrez and Valeria lived with Manjarrez's mother (between 2011 and 2016). Valeria did not call the police or see a doctor. On one occasion, Manjarrez hit Valeria in the head with a ceramic horse his mother used as a doorstopper. The horse broke and Valeria was bleeding.

In March 2016, after moving into the apartment, Manjarrez was involved in the incident that gave rise to his current domestic violence charge. When Valeria got home late after staying an extra hour or two at work, Manjarrez became jealous and accused her of cheating on him. During the ensuing argument, Manjarrez picked up a "really sturdy" plastic stool

---

[1]     The parties stipulated that, in connection with this incident, Manjarrez pleaded guilty to violating Penal Code section 273.5, former subdivision (e)(2) (now subdivision (f)(2)) with a prior conviction for violating section 243, subdivision (e). Further undesignated statutory references are to the Penal Code.

[2]     Valeria's mother testified she saw Valeria with black eyes, "a big gash on her head," and broken ribs. Manjarrez's daughter from his prior marriage testified she also saw Valeria with black eyes.

and hit Valeria in the head. As Valeria tried to shield her head with her hand, the stool struck her hand and broke her index finger.[3]

Eventually, Valeria began to defend herself when Manjarrez abused her. On one occasion, she pulled a knife on him, but she did not use it. Manjarrez also pulled a knife on Valeria on several occasions, and sometimes chased her with it or threw it at her.

Valeria testified about occasions on which Manjarrez physically abused her children. During the incident in the Hidden Springs house when Manjarrez punched Valeria in her pregnant stomach, he also "threw" Angelina when she became scared and cried. On another occasion, Manjarrez put his hands around Kaylee's neck when she was arguing with Valeria. Valeria testified Kaylee was scared by this.

*Sexual Abuse of Kaylee*

Kaylee was born in 2002 and was 17 when she testified at trial.

Kaylee described Manjarrez as "abusive" toward Valeria, and said there was "always" fighting, hitting, and yelling. The police came "pretty frequently." She testified she saw scratches and bruises on Valeria's face and arms. Kaylee also described the incident in which Manjarrez choked her for "disrespecting" Valeria during an argument. Kaylee was scared of Manjarrez during this incident. She testified he was bigger, taller, and stronger than her.

Kaylee testified Manjarrez sexually abused her "a few times at that home by the freeway and . . . one time at the apartment." She was not sure

---

3    The hand surgeon who treated Valeria testified at trial that she sustained a broken finger.

exactly when it began, but she believed it was when she was in elementary school, before either of her two youngest siblings were born.[4]

Kaylee described one incident in detail. She was watching a movie in her room, when Manjarrez told her to go watch it in his bedroom. Kaylee went to his room and continued watching the movie. A few minutes later, Manjarrez entered the bedroom and said he had to go to the bathroom. He shut the bedroom door, went into the bathroom, took off his clothes, and came out wearing only his underwear. He removed Kaylee's clothes and laid on top of her. She did not want him to, so she kept her legs raised to resist. She wanted to leave but could not because his weight was on top of her. Kaylee felt Manjarrez's "thing" rub against her inner thighs and her "woman's part." "[H]e tried to actually put his thing in [her] thing," but did not succeed. She knew she "felt his thing because it felt wet." When Manjarrez was done, he went to the bathroom "[t]o clean himself," and Kaylee got dressed and left.

Kaylee described, more generally, other occasions on which Manjarrez touched her breasts with his hand. Manjarrez would call her into his bedroom, close the door, sometimes undress her, and touch her breasts with his hands. This happened at least five times. Sometimes when Kaylee would try to leave the room, he would pull her back in, but she got away.

Kaylee testified she initially did not tell anyone what was happening because "she was scared [Manjarrez] was going to hurt [her]." She also thought, based on a previous experience, that Valeria would not believe her. Kaylee explained that when she and Angelina were once bathing together,

_____

4    Based on the fact Manjarrez lived in the Hidden Springs house from 2009 to 2011, and that the eldest of the two youngest siblings was born in 2011, we deduce the abuse began no later than 2011, when Kaylee was about nine years old.

Manjarrez told her to go take a shower with him.  This made her uncomfortable, and she did not go.  When Kaylee told Valeria about this incident, Valeria said Manjarrez was " 'just playing.' "  Kaylee did not think so.

Eventually, Manjarrez told Kaylee he had "changed towards [her]," which she understood to mean he was no longer interested in touching her.

### Sexual Abuse of Angelina

Angelina was born in 2006 and was 14 when she testified at trial.

Angelina described seeing Manjarrez and Valeria argue and fight. Sometimes it would "become physical" and "they would hit back and forth." Angelina saw that Valeria sometimes had bruises on her arms and shoulders (and "[m]aybe her legs"), but she did not remember ever seeing any injuries on Manjarrez.  Sometimes Valeria would have torn clothing after fights.

Angelina testified Manjarrez sexually abused her when she was 10 years old and lived in the apartment (around 2016).  She explained her school ended early (at 12:05 p.m.) on Wednesdays, so she and some of her siblings would be home with Manjarrez while Valeria was at work.  Manjarrez would tell Angelina to go to his room, where he would take off her clothes, put her on the bed, and "do things" to her.

When Manjarrez would ask Angelina if she wanted to go to the room, she would decline.  Manjarrez would take her to the room anyway, sometimes picking her up in the living room and carrying her to the master bedroom. Angelina tried to push him away, but she could not get away.  Manjarrez was taller, stronger, and heavier than Angelina.  Angelina was scared because she "didn't know what was happening" and thought Manjarrez might physically hurt her.  She did not yell for help because she thought she "could have got hit or something."

7

In the bedroom, Manjarrez would close the door, remove his and Angelina's clothes, put her on the bed facing down, and lay on top of her. Angelina testified Manjarrez began "humping" her, and she could feel the top of his "boy part" become "wet" as it touched near her bottom and between her legs and "butt cheeks." Manjarrez also touched Angelina's chest and stomach areas with his hands. Angelina would try to get up and leave the room, but could not because Manjarrez's bodyweight was on top of her. She testified this occurred most Wednesdays.

*Kaylee and Angelina Disclose the Sexual Abuse*

In May 2017, Angelina and Kaylee disclosed that Manjarrez had sexually abused them. The day they disclosed, they were upset with Manjarrez because he was yelling at their younger brother for throwing an object that hit Manjarrez's son in the eye. Manjarrez asked the girls' brother, " 'How would you like it if I poked your eye out?' " Valeria sent Kaylee and Angelina to the apartment laundromat to remove them from the situation.

In the laundromat, Angelina disclosed to Kaylee what Manjarrez "would do every Wednesday." Kaylee started crying and said it happened to her, too, when they lived at a different house. Kaylee testified she felt "sad" when she learned Angelina had been abused, explaining, "If I would have told when I was younger, that wouldn't have happened to her."

Kaylee called her maternal grandmother and told her what happened. The grandmother came and picked up the girls, called the police, and took the girls to the police station. When Valeria saw the girls at the police station later, she called them "liars" under her breath.

Kaylee and Angelina underwent forensic interviews during which they described experiencing sexual abuse similar to that which they described at

trial. Videos of the interviews were played at trial, and transcripts of the interviews are in the appellate record.

Kaylee testified she also disclosed the sexual abuse to a friend around the same time the police got involved (May 2017). The friend testified Kaylee made the disclosure the previous summer.

After the disclosure, Angelina went to live with her father, and Kaylee went to live with her maternal grandmother.

**Defense Evidence**

*Manjarrez's Testimony*

Manjarrez testified in his own defense. He acknowledged he and Valeria had a volatile relationship that involved mutual pushing and shoving.[5] However, despite years of training as a boxer, he denied he ever hit her with a closed fist. He also denied hitting Valeria with a stool, and claimed her finger broke when one of her children accidentally slammed it in a car door. He denied choking Kaylee.

Manjarrez admitted he gave his own daughter "favorable treatment over Valeria's children"—he "treated them horribly bad" and "abused [them] by letting them know each and every day that they weren't wanted." Manjarrez's own daughter had her own room, television, and video game system; got new clothes; was given name-brand food and drinks; and was taken to fast-food restaurants and amusement parks. Valeria's children "were specifically . . . left out of those experiences," and it upset them. To

---

[5] Manjarrez testified he had a similarly volatile relationship with his ex-wife, who testified at trial that he punched her in the face. Manjarrez's daughter with the ex-wife testified she saw Manjarrez hit the ex-wife on several occasions, and that he threatened to hit the daughter if she called the police.

Manjarrez, it "was very important for those kids to know that [he was] in control in that house." Later, Manjarrez tried to be better about providing all the children with the same food and clothing, but he still took only his own children on trips.

Manjarrez categorically denied sexually abusing Kaylee or Angelina. He acknowledged Angelina came home early from school on Wednesdays, but said he usually left for work around 1:00 or 1:15 each afternoon. He claimed he would not have been able to pick up and carry Angelina because he had a pinched nerve in his back. He admitted on cross-examination, however, that he worked out every day at a gym by hitting a punching bag and lifting weights (supposedly while sitting down).

### Expert Testimony

Dr. Hilda Chalgujian, a neuropsychologist who also has a law degree, testified as a defense expert. She opined that, "based on existing research, . . . psychological testing, [and] based on his history, [Manjarrez] does not fit the . . . criteria for your typical pedophile and/or opportunistic sex offender." We discuss Dr. Chalgujian's testimony in greater detail in Discussion part III, *post*.

## Verdicts and Sentence

The jury found Manjarrez guilty of five counts (two as to Kaylee, three as to Angelina) of forcibly committing a lewd act on a child under 14 (§ 288, subd. (b)(1)), and found true the allegation that Manjarrez committed the offenses as to multiple victims (§ 667.61, subd. (e)(4)).

The jury also found Manjarrez guilty of one count of misdemeanor domestic battery (§ 243, subd. (e)(1)), as a lesser included offense of the charged offense of inflicting corporal injury on a cohabitant with a prior domestic violence conviction in the previous seven years (§ 273.5, subd. (f)(1)).

10

The trial court sentenced Manjarrez to prison for 25 years to life on each of the five forcible lewd act convictions (for a total of 125 years to life), plus a concurrent term of one year for the domestic battery conviction.

## DISCUSSION

## I. Substantial Evidence Supports Manjarrez's Lewd Act Convictions

Manjarrez contends insufficient evidence supports his forcible lewd act convictions under section 288, subdivision (b)(1) because (1) "the act of picking up Angelina . . . and carrying her" to the bedroom does not satisfy the "force" element of the offense, and (2) "the evidence of the alleged domestic violence between [Manjarrez] and Valeria" does not satisfy the force or "duress" elements of the offense. We disagree.

Section 288, subdivision (b) makes it a felony for any person to willfully and lewdly commit a lewd or lascivious act upon or with the body of a child under the age of 14 "by use of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person." These elements differ from those found in section 288, subdivision (a) only through the requirement of force, violence, duress, menace, or fear to accomplish the lewd act. (*People v. Espinoza* (2002) 95 Cal.App.4th 1287, 1318.) "[I]t is the defendant's menacing behavior that aggravates the crime and brings it under section 288(b)." (*People v. Soto* (2011) 51 Cal.4th 229, 243 (*Soto*).)

" 'Force, in this context, means physical force that is " 'substantially different from or substantially greater than that necessary to accomplish the lewd act itself.' " ' " (*People v. Jimenez* (2019) 35 Cal.App.5th 373, 391 (*Jimenez*); accord *Soto, supra,* 51 Cal.4th at p. 242.)

" 'Duress,' " in this context, means " ' "a direct or implied *threat* of force, violence, danger, hardship or retribution sufficient to coerce a reasonable

11

person of ordinary susceptibilities to (1) perform an act which otherwise would not have been performed or, (2) acquiesce in an act to which one otherwise would not have submitted." ' " (*People v. Veale* (2008) 160 Cal.App.4th 40, 46; see *People v. Leal* (2004) 33 Cal.4th 999, 1004.) The existence of duress is determined by objectively evaluating the totality of the circumstances, including: the victim's and perpetrator's relative ages and sizes; their relationship, including the perpetrator's position of dominance or authority; the perpetrator's past and present conduct toward the victim; threats to harm the victim, or that revealing the molestation will jeopardize the family; and physically controlling the victim when he or she attempts to resist. (See *Veale*, at p. 46; *People v. Thomas* (2017) 15 Cal.App.5th 1063, 1072; *People v. Senior* (1992) 3 Cal.App.4th 765, 775.)

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' " (*People v. Powell* (2018) 5 Cal.5th 921, 944.) In doing so, we " 'presume[ ] in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (*Ibid*.) "Given this deferential standard of review, a 'defendant bears an enormous burden in claiming there is insufficient evidence' to support a conviction." (*People v. Wear* (2020) 44 Cal.App.5th 1007, 1020.)

Manjarrez has not met his enormous burden to show insufficient evidence supports his convictions. To the contrary, the record is replete with evidence showing he used force to accomplish the offense with respect to

12

Angelina, and exerted duress to accomplish the offenses with respect to both Kaylee and Angelina.

Regarding force, the prosecutor, in her closing argument, relied on Manjarrez picking up Angelina and carrying her into the master bedroom when she resisted.[6] This is substantially different force than that which was required for Manjarrez to molest Angelina once isolated in the master bedroom. Thus, substantial evidence supports the force element as to Angelina.

Substantial evidence also supports the duress element as to both victims. Manjarrez was older, bigger, taller, and stronger than his victims. He was in a position of dominance and authority over them, admitting he deliberately mistreated them and that it was "very important for [them] to know that [he was] in control." He had previously choked Kaylee, thrown Angelina, and repeatedly beat their mother in their presence. The girls testified they were actually afraid of Manjarrez. And Manjarrez committed the offenses in isolation in the master bedroom with the door closed. This is more than sufficient to establish duress.

Manjarrez relies on *People v. Hecker* (1990) 219 Cal.App.3d 1238, in which our court held that " '[p]sychological coercion' without more does not establish duress." (*Id.* at p. 1250.) However, our court in *People v. Cochran* (2002) 103 Cal.App.4th 8 later found "this language in *Hecker* is overly broad," and clarified that "[t]he very nature of duress is psychological

_____

6 The entirety of the prosecutor's closing argument regarding force is as follows: "First, I want to talk to you about force. Force must be substantially different from or substantially greater than the force needed to accomplish the act. In this case we see the force when the defendant carries Angelina into that bedroom. Okay. That's force substantially more than committing the act of molestation."

coercion." (*Cochran*, at p. 15.) In any event, the severe psychological coercion here operated in conjunction with an extremely abusive environment and the victims' actual fear of Manjarrez arising from his physical abuse of them and their mother.

Thus, substantial evidence supports Manjarrez's convictions for forcibly committing lewd acts on Kaylee and Angelina.

## II. No Instructional Error

Manjarrez contends the trial court committed three instructional errors in connection with the forcible lewd act counts. First, he contends the pattern jury instruction (CALCRIM No. 1111) improperly lessened the prosecution's burden of proof. Second, he contends the court erred by giving a pinpoint instruction identifying factors concerning duress. Third, he contends the court erred by failing to instruct the jury sua sponte regarding the offense of nonforcible lewd acts as a lesser included offense of forcible lewd acts. These contentions lack merit.[7]

### A. Legal Principles

"The trial court has a sua sponte duty to instruct the jury on the essential elements of the charged offense" (*People v. Merritt* (2017) 2 Cal.5th 819, 824) and all " 'general principles of law that are closely and openly connected with the facts before the court and necessary for the jury's understanding of the case' " (*People v. Simon* (2016) 1 Cal.5th 98, 143). This includes instructing on lesser included offenses "when the record contains

---

[7] The Attorney General maintains Manjarrez forfeited certain of these contentions by failing to raise them at trial. However, "even if there were [a forfeiture], we would exercise our discretion to address the issue on the merits to forestall a claim of ineffective assistance of counsel." (*People v. Lua* (2017) 10 Cal.App.5th 1004, 1014 (*Lua*).)

' " 'substantial evidence' from which a rational jury could conclude that the defendant committed the lesser offense, and that he is not guilty of the greater offense." ' " (*People v. Smith* (2018) 4 Cal.5th 1134, 1163; see *People v. Breverman* (1998) 19 Cal.4th 142, 162 (*Breverman*).)

Additionally, upon request, "[p]arties are entitled to legally correct and factually warranted pinpoint instructions"—that is, instructions that " ' "relate particular facts to a legal issue in the case or 'pinpoint' the crux of a [party]'s case." ' " (*People v. Lyon* (2021) 61 Cal.App.5th 237, 252.) "However, a trial court may properly refuse to give a pinpoint instruction that 'incorrectly states the law, is argumentative, duplicative, or potentially confusing [citation], or if it is not supported by substantial evidence.' " (*Ibid.*) A pinpoint instruction is argumentative if it is " 'of such a character as to invite the jury to draw inferences favorable to one of the parties from specified items of evidence.' " (*People v. Mincey* (1992) 2 Cal.4th 408, 437.)

"We review a claim of instructional error de novo." (*People v. Rivera* (2019) 7 Cal.5th 306, 326; see *People v. Nelson* (2016) 1 Cal.5th 513, 538 [" 'On appeal, we review independently the question whether the trial court

improperly failed to instruct on a lesser included offense.' "].)[8] "In reviewing a claim of instructional error, the court must consider whether there is a reasonable likelihood that the trial court's instructions caused the jury to misapply the law in violation of the Constitution. [Citations.] The challenged instruction is viewed 'in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.' " (*People v. Mitchell* (2019) 7 Cal.5th 561, 579; see *People v. Castillo* (1997) 16 Cal.4th 1009, 1016 (*Castillo*) [" '[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction.' "]; *People v. Quinonez* (2020) 46 Cal.App.5th 457, 465 (*Quinonez*) [a " 'jury instruction cannot be judged on the basis of one or two phrases plucked out of context' "].) "[W]e assume that jurors are intelligent persons capable of understanding and correlating all jury instructions which are given and, where reasonably possible, we interpret the instructions to support the judgment." (*People v.*

---

[8] Our court has noted that the California Supreme Court has applied the abuse of discretion standard to a trial court's determination of whether a pinpoint instruction is duplicative. (See *People v. Brugman* (2021) 62 Cal.App.5th 608, 622, fn. 3, citing *People v. Mora and Rangel* (2018) 5 Cal.5th 442, 497, and *People v. Gonzales* (2012) 54 Cal.4th 1234, 1297-1298.) However, our court applied the de novo standard of review because our court was addressing whether the pinpoint instruction accurately stated the law— a quintessentially legal issue—and the Attorney General did not argue for a different standard. (*Brugman,* at p. 622, fn. 3) Although the abuse of discretion standard likely applies to Manjarrez's claim that the challenged pinpoint is improperly argumentative, we will apply the de novo standard because the instruction passes muster even under this standard, and the Attorney General has not argued that a different standard applies.

*Jo* (2017) 15 Cal.App.5th 1128, 1152; see *People v. Sanchez* (2001) 26 Cal.4th 834, 852; *People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.)

## B.  No Error in Giving CALCRIM No. 1111

### 1.  Challenged Instruction

On the forcible lewd act counts, the trial court instructed the jury with CALCRIM No. 1111, which states (in pertinent part):

> "To prove that the defendant is guilty of this crime, the People must prove that:
>
> "1.  The defendant willfully touched any part of a child's body either on the bare skin or through the clothing;
>
> "2.  In committing the act, the defendant used force, violence, duress, menace, or fear of immediate and unlawful bodily injury to the child or someone else;
>
> "3. The defendant committed the act with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of himself or the child;  [¶]  AND
>
> "4. The child was under the age of 14 years at the time of the act.
>
> [¶] . . . [¶]
>
> "The *force* used must be substantially different from or substantially greater than the force needed to accomplish the act itself.
>
> "*Duress* means the use of a direct [or] implied threat of force, violence, danger, hardship, or retribution sufficient to cause a reasonable person to do or submit to something that he or she would not otherwise do or submit to.  When deciding whether the act was accomplished by duress, consider all the circumstances, including the age of the child and her relationship to the defendant.
>
> "An act is accomplished by *fear* if the child is actually and reasonably afraid or is actually but unreasonably afraid and the defendant knows of her fear and takes advantage of it."

17

## 2. Analysis

Section 288, subdivision (b)(1) makes it unlawful for a person to "commit[ ]" a lewd act on a child under 14 "*by use of* force, violence, duress, menace, or fear."[9]  (Italics added.)  Manjarrez contends the corresponding language in CALCRIM No. 1111—that, "[i]n committing the act, the defendant *used* force, violence, duress, menace, or fear"—lessened the prosecution's burden by allowing the jury to convict him if it found he merely "use[d] force *in the context of the act*" (that is, force merely *accompanied* the act), whereas the statute required the jury to find that he committed the act "by use of force" (that is, he *accomplished* the act *by force*).[10]  We disagree.

First, even in isolation, we do not find it reasonably likely the jury ascribed materially different meanings to the phrases "commits an act . . . by use of force" (§ 288, subd. (b)(1)) and "[i]n committing the act . . . used force" (CALCRIM No. 1111) such that the latter lessened the prosecution's burden.  Both phrases reasonably convey that the defendant's use of force facilitated the commission of the offense.  This is all the statute requires.  (See *Jimenez, supra*, 35 Cal.App.5th at p. 391 [" ' "an act is forcible if force facilitated the act rather than being merely incidental to the act." ' "].)

Second, even if the challenged phrase were reasonably susceptible in isolation to Manjarrez's proffered reading, it is not so susceptible when read

---

9    Section 288, subdivision (b)(1) states:  "A person who commits an act described in subdivision (a) by use of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person, is guilty of a felony and shall be punished by imprisonment in the state prison for 5, 8, or 10 years."

10    In connection with this argument, we sometimes use "force" as shorthand for all of the aggravating circumstances set forth in section 288, subdivision (b)(1).

in the context of CALCRIM No. 1111, as a whole. (See *Castillo*, *supra*, 16 Cal.4th at p. 1016 [we do not consider "parts of an instruction" in isolation]; *Quinonez*, *supra*, 46 Cal.App.5th at p. 465 [a" 'jury instruction cannot be judged on the basis of one or two phrases plucked out of context' "].) Specifically, the pattern instruction's definitions of force, duress, and fear convey that the act must be *accomplished*—not merely *accompanied*—by the defendant's use of that aggravating conduct. The definition of "*force*" sets the threshold quantum of force as that "needed *to accomplish* the act itself." (CALCRIM No. 1111, italics added.) Similarly, the definition of "*duress*" advises jurors of certain factors they may consider "[w]hen deciding whether the act was *accomplished by* duress." (*Ibid*., italics added.) Finally, the definition of "*fear*" is rooted in whether the "act is *accomplished by* fear." (*Ibid*., italics added.)

We thus conclude CALCRIM No. 1111 did not lessen the prosecution's burden to prove that Manjarrez committed the charged acts "by use of" force or duress, as required by section 288, subdivision (b)(1).

### C. No Error in Giving Pinpoint Instruction on Duress

### 1. Challenged Instruction

At the prosecutor's request, and over Manjarrez's objection, the trial court gave the following pinpoint instruction regarding duress:

> "Some circumstances that you may consider in determining whether duress existed is whether the acts occurred in an isolated location, the disparity in physical size, whether there was frequent interaction between the defendant and [Kaylee] and/or [Angelina], whether the abuse was continuous or involved a single incident, whether statements were made to [Kaylee] and/or [Angelina] by the defendant and the presence or absence of psychological dominance."

19

## 2. Analysis

Manjarrez contends the court erred by giving this pinpoint instruction because it was argumentative in that it (1) "contained references to the parties and complainants" (e.g., "whether there was frequent interaction between the defendant and [Kaylee] and/or [Angelina]"); and (2) presupposed the occurrence of abuse and asked jurors to determine only "whether the abuse was continuous or involved a single incident." We are not persuaded.

First, the pinpoint instruction begins by advising it contains circumstances the jury *may* consider in determining the existence of duress. Thus, the overarching tone of the instruction is permissive—it does not compel the jury to draw any particular inference. (See *People v. Standish* (2006) 38 Cal.4th 858, 869 [" '[T]he presumption [is] that the word "shall" . . . is ordinarily deemed mandatory and "may" permissive.' "]; *People v. Mendoza* (2000) 24 Cal.4th 130, 180-181 [pinpoint "instruction inform[ing] the jury that it *may* consider flight in connection with all other proven facts, giving the fact of flight the weight the jury deems appropriate . . . is not argumentative" because "it does not impermissibly direct the jury to make only one inference" (italics added)].)

Second, in the context of other jury instructions—CALCRIM No. 1111, in particular, and the instructions, as a whole—it is clear the pinpoint instruction is neither argumentative nor did it compel the jury to draw any particular inference.

As to CALCRIM No. 1111, the pinpoint instruction merely elaborated on the definition of duress incorporated into the second element of the offense. (CALCRIM No. 1111 ["2. In committing the act, the defendant used . . . duress . . . . [¶] . . . [¶] *Duress* means . . . ."].) The first, third, and fourth elements of the pattern instruction set forth the findings the jury was

20

required to make in the first instance that Manjarrez had committed a qualifying lewd act under section 288. The second element set forth the aggravating circumstances under which an act—*if* found by the jury, under the other elements, to have occurred—must have been committed for the act to qualify as forcible under section 288, subdivision (b)(1). The pinpoint instruction merely elaborated on the aggravating circumstances the jury might consider in determining whether the second element was satisfied. In this context, the pinpoint instruction's reference to "the abuse" did not presuppose that any abuse actually occurred; rather, it referred to an act of abuse the jury might have found to have occurred under the other elements of the pattern instruction. Thus, the reference to "the abuse" in the pinpoint instruction was no more argumentative than the reference to "the act" in CALCRIM No. 1111.

Additionally, although as Manjarrez points out, the pinpoint instruction refers to the victims by name, CALCRIM No. 1111 refers to the victims by their role. Indeed, the instruction's second, third, and fourth elements, as well as the definitions of *duress* and *fear*, all refer to "the child." The fact the pinpoint instruction referred to the children by their actual names did not render the pinpoint instruction unduly argumentative.

More generally, in the context of the overall charge to the jury, it is clear the pinpoint instruction did not compel the jury to draw an inference adverse to Manjarrez. To the contrary, the trial court repeatedly instructed the jury that Manjarrez was presumed innocent (see CALCRIM Nos. 100, 103), and that the prosecution bore the burden to prove his guilt beyond a reasonable doubt (see CALCRIM No. 103).

21

### 3. No Prejudice in Not Instructing on Lesser Included Offense

Manjarrez contends the trial court erred by failing to instruct the jury sua sponte regarding nonforcible lewd act as an uncharged lesser included offense of the charged offense of forcible lewd act. The parties agree that nonforcible lewd act is a lesser included offense of forcible lewd act. (See *People v. Chan* (2005) 128 Cal.App.4th 408, 421 [recognizing nonforcible lewd act under subdivision (a) of section 288 is a lesser included offense of forcible lewd acts under subdivision (b)(1) of that section].) But they disagree about whether substantial evidence supports that Manjarrez committed only the lesser offense and not the greater. Manjarrez contends such evidence exists because he testified he was unable to pick up and carry Angelina because of a pinched nerve in his back.[11] The Attorney General counters that Manjarrez's defense was that he did not commit *any* lewd acts on Kaylee or Angelina, not that he committed such acts but did so nonforcibly. We need not resolve this dispute because we conclude that even if the court erred by failing to instruct the jury regarding the lesser included offense, the error was harmless.

We review the failure to instruct on a lesser included offense for prejudice under the standard set forth in *People v. Watson* (1956) 46 Cal.2d 818. (See *Breverman, supra*, 19 Cal.4th at p. 165.) Under this standard, the failure to instruct on a lesser included offense "is not subject to reversal unless an examination of the entire record establishes a reasonable

---

[11] Although the prosecutor impeached Manjarrez on this claim by getting him to admit he still worked out at a gym daily (lifting weights and hitting the punching bag), we do not evaluate credibility when determining whether substantial evidence supports instructing on a lesser included offense. (See *Breverman, supra*, 19 Cal.4th at p. 162 ["In deciding whether there is substantial evidence of a lesser offense, courts should not evaluate the credibility of witnesses, a task for the jury."].)

probability that the error affected the outcome." (*Ibid*.) In applying this standard, we focus "not on what a reasonable jury *could* do, but what such a jury is *likely* to have done in the absence of the error under consideration." (*Id*. at p. 177.) In making that determination, we may consider the relative strengths and weaknesses of the evidence supporting the greater and lesser offenses, the jury instructions as a whole, the jury's findings, and the closing arguments of counsel. (See *People v. Larsen* (2012) 205 Cal.App.4th 810, 831; *Breverman*, at pp. 177-178.)

Considering the appellate record as a whole—the prosecutor's closing argument and the jury's verdicts, in particular—it is not reasonably probable Manjarrez would have obtained a more favorable result had the trial court instructed the jury on nonforcible lewd acts as a lesser included offense of forcible lewd acts. The prosecutor barely mentioned force (as opposed to other aggravating circumstances) in her closing argument—it takes up only five lines (less than one-fifth of one page) of the reporter's transcript—and she related it only to Manjarrez's conduct as to Angelina. (See fn. 7, *ante*.) By contrast, the prosecutor spent about one-half of one page in the reporter's transcript addressing fear as an aggravating circumstance, and an additional one and one-half pages addressing duress. The prosecutor's closing argument thus establishes she relied primarily on a duress theory, and only incidentally on a force theory.

The jury's verdicts reflect the prosecutor's primary focus on duress, rather than force. The force theory related primarily to Manjarrez picking up and carrying Angelina; there was no similar conduct alleged as to Kaylee. Yet, the jury found Manjarrez guilty on all counts as to both Kaylee and Angelina, thereby indicating the jury relied on the duress theory rather than the force theory. It is not reasonably probable that the jury would have

23

applied the duress theory—the circumstances of which applied equally to both victims—only to Kaylee, while applying the force theory only to Angelina.  (See, e.g., *People v. Thomas* (2007) 146 Cal.App.4th 1278, 1294 ["In light of the evidence of defendant's other sexual offenses against the other boys, no reasonable jury could have concluded that the incident was merely an offensive touching rather than a lewd act within the meaning of section 288."], disapproved of on another ground by *People v. Shockley* (2013) 58 Cal.4th 400; *People v. Campbell* (2015) 233 Cal.App.4th 148, 167 [although the jury's verdicts with respect to certain counts may " 'not *categorically* establish that the error [in failing to instruct on lesser included offenses as to other counts] was harmless,' " " 'it is clear that . . . a jury's determination on a factual issue under other instructions is relevant to determining whether an instructional error is harmless' "].)

Manjarrez argues the alleged instructional error is not harmless because the fact the jury acquitted him on the greater offense of inflicting corporal injury on a cohabitant, and instead convicted him of the lesser offense of domestic battery, indicates "the jury was clearly willing to accept part of the claims of the parties and reject others."  We are not persuaded.  Manjarrez's argument relates to a different type of conduct, committed against a different type of victim, as established by different evidence.

Because it is not reasonably probable that Manjarrez would have obtained a more favorable outcome had the trial court instructed on the lesser included offense of nonforcibly committing a lewd act, any potential error was harmless.

### III.  No Error in Cross-examination of Defense Expert

Manjarrez contends the trial court erred by allowing the prosecutor to cross-examine the defense expert about a prior case in which she served as a

defense expert, and about a published California Supreme Court opinion that contradicted her opinion that there is a profile for a typical child molester.[12] We disagree.

### A. Cross-examination Regarding a Prior Case

### 1. Background

Defense expert Dr. Chalgujian testified on direct examination that Manjarrez "does not fit the . . . criteria for your typical pedophile and/or opportunistic sex offender."

On cross-examination, the prosecutor questioned Dr. Chalgujian about industry standards providing that psychologists testifying in legal proceedings strive for "impartiality," which she understood to mean "you're fair to both sides" rather than being "one-sided." Dr. Chalgujian maintained that even though she was being paid by the defense (between $5,000 and $7,500), she did not consider herself to be "part of the defense team"; rather, "because of [her] unique skills," her "role in a courtroom" is "to educate the trier of fact." The prosecutor explored at length with Dr. Chalgujian the meaning and significance of impartiality when testifying in a forensic capacity.

The prosecutor then questioned Dr. Chalgujian about her role as a forensic expert in a prior murder case. When Manjarrez objected on relevance grounds, the prosecutor explained it related to "[b]ias." The trial court overruled the objection.

---

[12] The Attorney General maintains Manjarrez forfeited these challenges by objecting at trial on different grounds than he asserts on appeal. However, "even if there were [a forfeiture], we would exercise our discretion to address the issue on the merits to forestall a claim of ineffective assistance of counsel." (*Lua*, *supra*, 10 Cal.App.5th at p. 1014.)

On further cross-examination, Dr. Chalgujian confirmed that when she served as an expert in the prior case, she was in law school and was clerking for the criminal defense attorney who retained her in that case, who was also the dean of her law school. Despite this entanglement, she insisted she was impartial in that case.

The trial court initiated a sidebar conference, during which the court stated it was "incredulous" that Dr. Chalgujian could not see she had a "glaring" conflict of interest in the prior case.[13] The prosecutor stated she had the transcript from the prior trial, which showed Dr. Chalgujian had not sought an opinion from any professional association to determine whether her role would create a conflict of interest. Defense counsel stated he had read about the prior case "when he looked her up," but he was not familiar with specific details because he did not have the trial transcript. The court ended the sidebar.

When cross-examination resumed, Dr. Chalgujian insisted there was no conflict of interest and she "wasn't partisan" in the prior case because she "was fair and square" due to her "specific skills."

On recross, Dr. Chalgujian confirmed she stated in her report in this case that her "referral reason"—"why [she] was hired in this case"—was "for a psychological evaluation to help assist in diagnostic defense planning in pending legal proceedings." She confirmed she had, in fact, "participated in defense planning" in this case.

---

13    The trial court clarified in a sidebar conference the next day that "it's really not a *conflict* that [the court] was concerned about; it's the *bias* . . . of a person who works for a firm and then comes into court as appearing to be an expert that's supposed to be helping to find what the truth is rather than necessarily being aligned with one particular side." (Italics added.)

## 2. Legal Principles

" 'It is settled that the trial court is given wide discretion in controlling the scope of relevant cross-examination.' [Citation] ' "[T]he scope of cross-examination of an expert witness is especially broad . . . ." ' [Citations.] 'The prosecutor may properly cross-examine a witness to show bias, prejudice, interest, hostility or friendship toward a party that would bear on the question of the credibility of the witness. [Citations.] An expert's testimony in prior cases involving similar issues is a legitimate subject of cross-examination when it is relevant to the bias of the witness.' " (*People v. Steskal* (2021) 11 Cal.5th 332, 359 (*Steskal*); see *People v. DeHoyos* (2013) 57 Cal.4th 79, 122-124 (*DeHoyos*) [no error in allowing prosecutor to cross-examine defense expert regarding failure to preserve interview tapes in prior case, where that failure was relevant to showing the expert's knowledge that underlying raw data in the present case "was significant to the prosecution and should be preserved"]; Evid. Code, § 351 ["Except as otherwise provided by statute, all relevant evidence is admissible."]; *id.*, § 210 [" 'Relevant evidence' . . .includ[es] evidence relevant to the credibility of a witness"]; *id.*, § 721, subd. (a) ["a witness testifying as an expert . . . may be fully cross-examined as to . . . his or her qualifications"].)

"On appeal, we review the trial court's ruling on the scope of cross-examination for an abuse of discretion." (*DeHoyos*, *supra*, 57 Cal.4th at p. 123.)

## 3. Analysis

The trial court did not abuse its discretion by allowing the prosecutor to cross-examine Dr. Chalgujian about her expert role in a prior case. Dr. Chalgujian claimed to be impartial in this case and touted her "unique skills" and role in "educat[ing] the trier of fact." Her claim to have been similarly

impartial in a prior case—under circumstances that indicated to the trial court (and us) a "glaring" bias—warranted cross-examination about the circumstances of that case in order to inform the jury about the reliability of Dr. Chalgujian's opinion that she was impartial in this case.

Contrary to Manjarrez's assertion, cross-examination about the fact Dr. Chalgujian testified as a defense expert for a criminal defense lawyer she worked for and who was also the dean of the law school she was then attending was relevant to more than just showing she "was a 'defense' expert." As explained, it shed light on the thought-process by which she concluded she was impartial in this case. Moreover, even if the purpose of the cross-examination was merely to paint Dr. Chalgujian as "a 'defense' expert,'" the questioning would still have been relevant to the issue of bias. (See, e.g., Jones et al., Cal. Practice Guide: Fed. Civil Trials and Evidence (The Rutter Group 2022), ¶ 10:207 ["the fact an expert witness has testified in a large number of cases exclusively for one side or the other tends to show a bias in favor of that side" (italics omitted)].)

Manjarrez cites the fact Dr. Chalgujian was not disciplined by the state bar or any psychological association for her conduct in the prior case. However, he cites no authority to support the proposition that discipline is a prerequisite to allowing cross-examination about an expert's potential bias. We doubt any such authority exists—when it comes to cross-examining an expert about bias, the bar is low and the scope is broad. (See *Steskal*, *supra*, 11 Cal.5th at pp. 358-359; *DeHoyos*, *supra*, 57 Cal.4th at pp. 122-124; *People v. Wilson* (2005) 36 Cal.4th 309, 358 [" 'In cross-examining a psychiatric expert witness, the prosecutor's good faith questions are proper even when they are, of necessity, based on facts not in evidence.' "].)

28

Finally, citing two questions out of two days' worth of testimony, Manjarrez complains that "[t]he prosecutor was permitted to engage in argumentative questioning on this issue."[14] But Manjarrez fails to explain how the prosecutor asking a few argumentative questions bears on the relevance of an expert's potential bias, or how the questions prejudiced the outcome of the case.

## B. Cross-Examination About a Supreme Court Opinion

### 1. Background

On direct examination, Dr. Chalgujian opined that, "based on existing research, . . . psychological testing, [and] based on his history, [Manjarrez] does not fit the . . . criteria for your typical pedophile and/or opportunistic sex offender." She identified relevant criteria as including under-employment, poor intelligence, alcohol and substance abuse, depression, psychopathy or sociopathic tendencies, a history of watching or seeking child pornography, and a history of adult relationships with women his age.

On cross-examination, the prosecutor questioned Dr. Chalgujian about the fact she stated in her expert report that studies support her assertion about the profile of a typical child molester, yet she did not specifically cite or produce any such studies. Dr. Chalgujian explained she "was busy" and "did not have the opportunity" before trial to produce certain of the materials she alluded to. She ultimately conceded she could not cite any particular study that supported her position, but maintained her view was generally accepted in her field.

---

[14] The two cited questions are (1) "But you're not supposed to be partisan, you're not supposed to have a side whether it's the defendant or the People"; and (2) "Okay. That doesn't sound impartial to me."

The prosecutor questioned Dr. Chalgujian about an industry ethical guideline regarding "gaining and maintaining competence." The expert agreed this "important" guideline requires practitioners to "keep abreast of the developments in the field of psychology and the law." The prosecutor then asked Dr. Chalgujian if she was "familiar with the California Supreme court case *People v. McAlpin* [(1991) 53 Cal.3d 1289 (*McAlpin*)]." Manjarrez objected on relevance grounds, and the court and counsel conferred at sidebar.

At sidebar, the prosecutor argued *McAlpin* is relevant because it "stands for the proposition that there is no profile for a child molester," thus contradicting Dr. Chalgujian's opinion. The prosecutor maintained the case was "fair game for impeachment" because Dr. Chalgujian "acknowledged" she is subject to a "specific guideline" that says she "need[s] to keep abreast of developments in the area of psychology and law."

Defense counsel responded that *McAlpin* is not relevant because it was decided in 1991 and relied on studies "older than that."

The trial court overruled the defense objection, explaining the court "would expect the person who's testifying about there being certain criteria that you'd expect in a sexual deviant . . . to be aware of a case that said there are no such criteria."

Continuing on cross-examination, the prosecutor confirmed with Dr. Chalgujian that *McAlpin* "deals with the fact that there's no profile of a typical child molester," "cites to sexual deviance research," and that Dr. Chalgujian "had an opportunity to review the . . . research that's cited in [*McAlpin*]." Specifically, Dr. Chalgujian acknowledged one of the cited studies "says there's not one profile," but rather, "[t]hey can come from all aspects of life, affiliations, et cetera." While she downplayed this as being but

30

"one study," she conceded it was "completely opposite to what [she] testified to," and she could not cite any particular studies that supported her position.

The prosecutor questioned Dr. Chalgujian about the reliability of the studies cited in *McAlpin*. When asked if one of the study's findings were accurate, Dr. Chalgujian responded, "It's obviously cited. Yes." She implied the study "might not be accepted in [her] field" because of its age, but she acknowledged she relied on studies of the same or older vintage. She also acknowledged she relied on research conducted by one of the same researchers cited in *McAlpin*. Ultimately, Dr. Chalgujian "made it clear that there's nothing new that [she] found in the literature" that was inconsistent with the *McAlpin* study's findings; to the contrary, "the research in this area has been consistent through the years, nothing new."

## 2. Legal Principles

### (a) Cross-examination

As noted, " ' "[t]he scope of cross-examination of an expert witness is especially broad' " ' (*Steskal*, *supra*, 11 Cal.5th at pp. 358-359), and extends to the expert's bias (*ibid*.), credibility (Evid. Code, § 210), qualifications (*id*., § 721, subd. (a)), and bases for his or her opinions (*ibid*.).

However, Evidence Code section 721, subdivision (b) limits the extent to which an expert witness may be cross-examined about scientific publications. This provision states in part:

> "(b) If a witness testifying as an expert testifies in the form of an opinion, he or she may not be cross-examined in regard to the content or tenor of any scientific, technical, or professional text, treatise, journal, or similar publication unless any of the following occurs:
>
> "(1) The witness referred to, considered, or relied upon such publication in arriving at or forming his or her opinion.

31

"(2)  The publication has been admitted in evidence.

"(3)  The publication has been established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice."

The reliability of scientific publications may be established by any of the three methods identified in the statute.  (See *Paige v. Safeway Inc.* (2022) 74 Cal.App.5th 1108, 1122 (*Paige*) ["Since the statutory language prefaces these three situations with the language 'unless *any* of the following occurs,' each situation serves as an independent basis for use of a publication on cross-examination."].)

We review the trial court's ruling on the scope of cross-examination for an abuse of discretion.  (*DeHoyos*, *supra*, 57 Cal.4th at p. 123.)

### (b)  McAlpin

The *McAlpin* court addressed whether expert testimony is proper on the subject of whether there is a profile of a typical child molester.  (*McAlpin*, *supra*, 53 Cal.3d at pp. 1302-1303.)  The court concluded this topic *is* a proper subject of expert opinion because jurors would likely rely on crude—and "false" (*id.* at p. 1303)—stereotypes, such that expert opinion would " 'assist the trier of fact' " on "a subject that is sufficiently beyond common experience' " (*id.* at p. 1299, quoting Evid. Code, § 801, subd. (a)).

The *McAlpin* court explained why the topic was beyond common experience:

> "This stereotype [of a typical child molester] . . . is false.  The same studies [that summarized common stereotypes] report that in most cases the child molester is not in fact a stranger to his victim, is not an old man, is not an alcoholic, is not mentally retarded, and is not homosexual.  A recent major study . . . found that their ages ranged from 13 to 76, with a mean age of 31.5 years; many were well educated; almost 65 percent were employed; they 'came from a broad spectrum of socioeconomic levels . . . ; their religious

affiliations were various; and in sum, they were 'a very heterogeneous group.' [Citation.] 'Thus, it is appropriate to conclude that under the current state of scientific knowledge, there is no profile of a "typical" child molester.' " (*McAlpin*, *supra*, 53 Cal.3d at p. 1303, fn. omitted.)

### 3. Analysis

The trial court did not abuse its discretion in overruling Manjarrez's relevance objection to cross-examination of Dr. Chalgujian about *McAlpin*. She acknowledged that when testifying in legal proceedings, it is "important" to comply with the industry guideline that requires experts to "keep abreast of the developments in the field of psychology *and the law*." (Italics added.) Dr. Chalgujian's compliance with this industry guideline was a relevant factor for the jury to consider in evaluating her expert qualifications and bases for her opinions. Whether Dr. Chalgujian was aware of a California Supreme Court opinion that addressed the very issue on which she was testifying as an expert reflected on her compliance with the guideline. Thus, it was a relevant line of inquiry.

In a new argument first raised on appeal, Manjarrez argues that allowing cross-examination of Dr. Chalgujian about *McAlpin* improperly "shoe-horn[ed] the studies relied upon by the Supreme Court" into this case in violation of Evidence Code section 721, subdivision (b)'s limitation on cross-examining experts about scientific publications. We are not persuaded.

As a preliminary matter, Manjarrez cites no authority specifically addressing whether a *court opinion* that discusses scientific publications constitutes a "scientific, technical, or professional text, treatise, journal, or similar publication" within the meaning of section 721, subdivision (b). Although a court opinion does not appear to fall within the plain meaning of the categories of scientific publications identified in the statute, we will

33

assume for the sake of argument that it does. Even so, the trial court acted within its discretion in allowing cross-examination about the studies relied on by the *McAlpin* court because they were "reliable." (Evid. Code, § 721, subd. (b)(3) [cross-examination about a publication is permissible if "[t]he publication has been established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice"]; see *Paige*, *supra*, 74 Cal.App.5th at p. 1122 ["The plain language of Section 721(b)(3) unambiguously allows a party to cross-examine an adverse expert about the content and tenor of a publication so long as the publication has been established as a reliable authority."].)

First, the reliability of the scientific publications cited in *McAlpin* could have been established through judicial notice. (See Evid. Code, § 721, subd. (b)(3) [allowing cross-examination about a scientific publication if "[t]he publication has been established as reliability authority . . . by judicial notice"].) The trial court could have taken—and, indeed, would have been *required* to take—judicial notice of *McAlpin*. (See Evid. Code, § 451 ["Judicial notice shall be taken of . . . [¶] (a) The decisional . . . law of this state"].) This would extend to the fact the *McAlpin* court cited the scientific publications for their authoritative value (rather than as mere case-specific evidence in the appellate record), thereby establishing the studies' reliability.

Second, Dr. Chalgujian essentially admitted the studies cited in *McAlpin* were reliable. (See Evid. Code, § 721, subd. (b)(3) [allowing cross-examination about a scientific publication if "[t]he publication has been established as reliability authority by the testimony or admission of the witness"].) Indeed, she acknowledged the studies were reliable precisely *because* they were cited in *McAlpin*. When asked if one study was accurate, she responded, "It's obviously cited. Yes." She also relied on research

34

conducted by one of the same researchers cited in *McAlpin*. And, although she initially implied one study may be too old to be reliable, she later acknowledged she relied on similarly aged studies and that "the research in this area has been consistent through the years, nothing new." Thus, it would have been within the trial court's discretion to find that the studies cited in *McAlpin* were reliable. (See *Paige*, *supra*, 74 Cal.App.5th at p. 1126 [expert's testimony that publication's author "is a well-recognized international standards organization whose views are generally accepted in the scientific community . . . established that the [publication at issue] was a reliable authority"].)

We disagree with Manjarrez that allowing cross-examination about *McAlpin* violated his due process rights. As noted, the *McAlpin* court cited published scientific studies for their independent authoritative value, and not as case-specific evidence found only in the appellate record in that case. The studies related to the field in which Dr. Chalgujian claimed to be an expert. She testified she "ha[d] an opportunity to review this particular case" and the "research that's cited in [it]." Finally, Dr. Chalgujian was given the opportunity to, and did, further address the case on redirect examination.

### C. No Prosecutorial Misconduct

Because we conclude the scope of the prosecutor's cross-examination of Dr. Chalgujian was proper, we reject Manjarrez's claim that the prosecutor engaged in misconduct by questioning the expert about her work in a prior case or about *McAlpin*.

Manjarrez also complains that "the prosecutor obtained a transcript of the prior trial and . . . did not disclose it to the parties or the court." But the transcript clearly related to impeachment of Dr. Chalgujian, and Manjarrez has cited no authority indicating a prosecutor is required to disclose

nonexculpatory impeachment material. (See *People v. Wilson* (2005) 36 Cal.4th 309, 333 ["the prosecution did not commit misconduct . . . by not disclosing [nonexculpatory] information on a witness the defense intended to present"]; *People v. Tillis* (1998) 18 Cal.4th 284, 289-296 [no discovery or due process violation where prosecutor did not disclose information showing that a psychologist testifying as a defense expert on the effects of heroin had been arrested years earlier for using heroin during the lunch break in a trial in which he was testifying as an expert].)

## IV. Cumulative Error

Manjarrez contends that even if the claimed errors are harmless when considered separately, they are prejudicial and violate his due process rights when considered cumulatively. However, because we have found no error, and assumed only for the sake of argument that one error occurred, there are not multiple errors to cumulate. (See *People v. Bennett* (2009) 45 Cal.4th 577, 618 ["With the exception of a single erroneous evidentiary ruling, which was harmless beyond a reasonable doubt, we have rejected all other claims of error; thus there is no cumulative error."].)

## DISPOSITION

The judgment is affirmed.

HALLER, J.

WE CONCUR:

McCONNELL, P. J.

DATO, J.